# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| GLADIUS NETWORK LLC | **Civil Action No.** _____ |
| 401 Ryland Street, Ste. 200-A | |
| Reno, Nevada, 89502, | |
| Plaintiff, | **COMPLAINT** |
| vs. | |
| KRYPTON BLOCKCHAIN HOLDINGS LTD., d/b/a KRYPTON CAPITAL | |
| Dragonara Road | |
| Dragonara Business Center 5th Floor | |
| STH 3141 St. Julian's, Malta, | |
| Defendant. | |

Plaintiff Gladius Network LLC ("Plaintiff" or "Gladius") respectfully alleges, with knowledge as to its own actions and on information and belief as to all other allegations, including but not limited to the actions of others, as follows:

1. This is a civil action related to the Memorandum of Understanding (the "Memorandum"), entered into by and between Gladius.io[1] and Krypton Blockchain Holdings Ltd. ("Defendant" or "Krypton"). Plaintiff seeks a declaratory judgment that the Memorandum is void and unenforceable.

2. In the alternative, Plaintiff seeks rescission of the Memorandum based on certain material misrepresentations made by Defendant prior to and up through Plaintiff's execution of the Memorandum. Specifically, Defendant led Plaintiff to falsely believe that the funds it received

---

[1] Gladius.io is the website for Gladius Network LLC. It is not a separate legal entity.

came from Defendant when they belonged to (and were in fact paid to Plaintiff directly by) one or more third parties, and did not inform Plaintiff that provision of such funds by these third parties, to whom Plaintiff would not have wished to sell a stake in its business, had been made as a prerequisite to their contemplated acquisition of a controlling interest in Krypton.

## I.    FACTUAL ALLEGATIONS

### a.    Gladius is Founded and Introduced to Krypton

3.    In the Spring of 2017, Max Niebylski, Alexander Godwin, and Marcelo McAndrew, three friends from high school who were studying at the University of Maryland (collectively, the "Founders"), decided to found a cyber-security startup specializing in the use of Blockchain technology to prevent cyber-attacks.

4.    The Founders had developed a novel idea for how to effectively protect users from distributed denial of services ("DDOS") attacks, which have become a popular cyber weapon for criminals to use to attack a victim's website or network. These attacks function by flooding the target website or network with manufactured internet traffic, which ultimately overloads the system and renders it inoperable. Plaintiff's product promised to mitigate DDOS attacks by redirecting the incoming traffic across a decentralized network of computers, thus diminishing the ability of bad actors to successfully focus their attack on a single website or network.

5.    The company, Gladius Network LLC, was incorporated in June 2017. Soon thereafter, the Founders began to seek investors. Through their counsel, Paul Hastings, Plaintiff was introduced to Nadav Dakner, CEO of an Israeli marketing firm called InboundJunction. In September 2017, Plaintiff hired Mr. Dakner to facilitate investor interest in its business, and on November 6, 2017, Mr. Dakner introduced Plaintiff to Krypton.

2

**GLADIUS NETWORK LLC'S COMPLAINT**

6.      Krypton, a Maltese corporation headquartered in Ukraine, was introduced to Plaintiff by Mr. Dakner as a company that specializes in investing in start-ups which utilize Blockchain technology and cryptocurrency.

7.      Accordingly, and based in part on Mr. Dakner's recommendation, Plaintiff was optimistic about the potential of a partnership with Defendant.  The feeling appeared to be mutual. Indeed, on November 6, 2017, the very same day that Plaintiff and Defendant were introduced, Defendant's founder and controlling shareholder, Ilan Tzorya, proposed that the parties enter into a pair of transactions. He provided a rough outline of the arrangement, which would include (1) a purchase of equity in Plaintiff; and (2) a promise to purchase an unspecified number of tokens that would be issued by Plaintiff in the future, which in turn would be redeemable for certain cyber-security services to be provided by Plaintiff in the ordinary course of business.

8.      Plaintiff responded by indicating that it would be interested in entering into discussions regarding the details of a deal along these lines. Mere hours later, Defendant drafted and sent to Plaintiff a copy of the Memorandum.

9.      By its own terms, the Memorandum was "short and most of all simple" and was not intended to create or describe a contractual relationship between the parties. To the contrary, the Memorandum explicitly acknowledged that it was not intended "to cover[] all the areas of concern of the signatories,"  as "there [was] no reason for the Parties to spend considerable time negotiating a detailed MOU and then repeat the exercise (and duplicate costs)" in drafting the actual agreements which would constitute the parties' contractual relationship.

10.      Accordingly, the Memorandum provided sparse detail on the proposed transactions, referencing both the equity purchase and the token purchase in a single sentence in recital (c) of the Memorandum:

**GLADIUS NETWORK LLC'S COMPLAINT**

> "The Subscriber will invest in the Company the amount of
> US$600.000 (six hundred thousand US dollars) by purchasing 10%
> of the shares of the Company and tokens to be issued by the
> Company (the "tokens") valued at US$600.000 after applying a
> discount of 80%."

11.     Plaintiff reviewed and made certain minor revisions to the Memorandum before

returning it to Defendant on November 6 and 7, 2017.

12.     On November 9, 2017, Plaintiff received another draft, this one also containing

minor, non-material revisions. In order to commence contractual negotiations regarding the

agreements which would actually describe the parties' rights and obligations, Max Nieblyski, one

of the Founders, affixed an electronic signature to the Memorandum and returned it to Defendant

that same day.

13.     At all times, Plaintiff understood the Memorandum to be a preliminary and non-

binding document which would simply facilitate the Parties' entry into and provide a basis for

further discussions regarding a concrete business opportunity.  Defendant never expressed any

contrary understanding, and the terms of the Memorandum itself, which was initially drafted by

Defendant, support Plaintiff's reading of same. It was further understood by Plaintiff that, despite

its initial signature to the Memorandum, the terms of the parties' eventual contractual arrangement,

if any, would continue to change over time.

### b.     The Parties Commence Contractual Negotiations Regarding a Share Purchase Agreement, a License and Services Agreement, and an Advisory Agreement

14.     Consistent with this understanding, Defendant did not return a signed copy of the

Memorandum. Instead, over the ensuing weeks, the parties began negotiating three executable

contracts that would encapsulate the parties' intentions as preliminarily envisioned in the

Memorandum and in numerous other discussions regarding the parameters of the prospective deal.

**GLADIUS NETWORK LLC'S COMPLAINT**

These agreements—a Purchase Agreement, a License and Services Agreement, and an Advisory Agreement (together, the "Final Status Agreements")—were intended to serve as the only operative and legally binding agreements on the parties.

15.    Between November 9, 2017 and November 20, 2017, as these discussions were ongoing, representatives for Defendant (including counsel) also sent Mr. Nieblyski of Gladius a number of requests pertaining to the language of the Memorandum.  Specifically, Defendant sent comments via text or chat to Mr. Nieblyski, who then incorporated those comments into the Memorandum to include the requested language and then returned a copy of same to Defendant.

16.    These changes to the text of the Memorandum purported to reflect some (but nowhere near all) of the terms being discussed by the parties in connection with the Final Status Agreements. In particular, they included *only* certain terms which were beneficial to Krypton, including the provision of an additional 5% equity interest in Gladius in exchange for no additional consideration and certain changes pertaining to control of Defendant's funds. Notably, Defendant did not request that Mr. Nieblyski add to the Memorandum a number of other material terms being discussed by the parties which were beneficial to Plaintiff and constituted the consideration Plaintiff was bargaining for at the time, including a worldwide license to Defendant's intellectual property ("IP") rights and an agreement to provide Plaintiff with certain third-party advisory services.

17.    That said, and consistent with Plaintiff's understanding that the Memorandum was a non-binding and preliminary document, Mr. Niebylski readily acquiesced to Defendant's requests, which he did not believe had any legal significance given the parties' ongoing negotiations over the Final Status Agreements intended to reflect the actual terms of the ultimate transaction between the parties.  Indeed, Mr. Nieblyski did not forward Krypton's various language

5

edits to Gladius's counsel at Paul Hastings for review or attempt to add to the Memorandum the many other material terms to which Krypton had agreed during the parties' ongoing discussions (including all of the terms operating to Gladius's benefit). Nor did Mr. Nieblyski ever re-sign or update his signature on any of the various copies of the draft Memorandum he sent to Defendant. His initial signature from the November 9, 2017 draft simply remained on all later iterations of the document.

18.     As these conversations were occurring, two advance payments of Bitcoins were deposited in digital wallets (secure online bank accounts for cryptocurrency) owned by Gladius. The first payment, made on November 10, was for 45.3859247 Bitcoins. This total amount was transferred to Gladius from two separate wallets and was worth approximately $300,000 at the time of transfer. The second payment, made on November 20, was for 36.5 Bitcoins, which was also worth approximately $300,000 at the time of transfer.

19.     Based on representations made by Defendant, Gladius believed that both payments were made by Defendant and were of Bitcoins owned by Defendant.

20.     Two days later, on November 22, after extensive negotiations and at Defendant's request, Plaintiff delivered to Defendant drafts of each of the Final Status Agreements intended to reflect the terms upon which the parties had agreed. These agreements expanded upon and differed significantly from the transactions envisioned in the Memorandum's various iterations, including with regard to the consideration that would be provided in exchange for an equity interest in Plaintiff and a number of other material terms, such as the provision of certain intellectual property ("IP") rights and advisory services to Plaintiff. Indeed, neither of these provisions, despite being the subject of extensive discussions between the parties, is mentioned anywhere within the Memorandum.

**GLADIUS NETWORK LLC'S COMPLAINT**

21.   ***Purchase Agreement***. The Purchase Agreement was drafted as the operative contract that would bind the parties to the token purchase contemplated in recital (c) of the Memorandum. The Purchase Agreement significantly expanded upon the transaction memorialized in the Memorandum and included material terms and provisions not contained in the Memorandum. Specifically, the Purchase Agreement included the quantity of tokens to be sold to Defendant, the time period in which the transfer of funds and tokens would take place, and a number of representations and warranties on behalf of both parties. Further, the Purchase Agreement clarified that the investment of $600,000 originally contemplated in the Memorandum was intended only as consideration for the purchase of tokens; absent from the Purchase Agreement was *any* reference to the procurement of an equity interest in Plaintiff in exchange for that investment.

22.   ***License and Services Agreement***. The equity interest transaction envisioned in recital (c) of the Memorandum was encapsulated in a separate contract, the License and Services Agreement, which significantly expanded upon the equity interest transaction memorialized in the Memorandum, and again included material terms and provisions not contained in the Memorandum. Specifically, while the Memorandum referenced no separate consideration in exchange for the equity interest in Plaintiff, the License and Services Agreement included the provision of significant rights in Defendant's intellectual property and made clear that this was to be the consideration for the provision of any equity interest in Plaintiff's business. Under the terms of the contract, Plaintiff was to be granted a "worldwide, perpetual, irrevocable, royalty-free" license to use, and to sell products and services incorporating, certain intellectual property possessed by Defendant. Consistent with the parties' understanding regarding the preliminary,

7

**GLADIUS NETWORK LLC'S COMPLAINT**

non-binding nature of the Memorandum, it was silent on this part of the parties' agreement even though such discussions had been underway as the Memorandum's terms were being changed.

23.    ***Advisory Agreement***. The parties negotiated and drafted a third agreement, the Advisory Agreement, to encapsulate a referral fee for token sales which was contemplated in recital (d) of the Memorandum.  The Advisory Agreement significantly expanded upon the referral fee memorialized in the Memorandum, and again included material terms and provisions not contained in the Memorandum. Specifically, while the Memorandum referenced no exchange of consideration for Defendant's receipt of 10% of gross proceeds resulting from a sale of tokens to a purchaser referred by Defendant, the Advisory Agreement made clear that such referral fees would be compensated through the provision of third party advisory services by Defendant to Plaintiff on certain matters. Again, the Memorandum was silent on this part of the parties' agreement even though such discussions had been underway as the Memorandum's terms were being changed.

24.    In delivering these draft Final Status Agreements to Defendant, Plaintiff expected that they would be signed and executed or that, at the very least, revisions would be provided and negotiations would continue.

25.    Defendant apparently had other ideas. Instead of sending back comments on the draft Final Status Agreements, Defendant waited until December 8 (that is, after more than two weeks had gone by) and sent to Plaintiff a signed copy of the Memorandum dated November 9, 2017, as altered between November 7 and November 20 pursuant to Defendant's various requests. Interestingly, this was the very first version of the Memorandum a Krypton representative had signed, notwithstanding the passage of almost a month since the parties had begun negotiating the terms of the Final Status Agreements (and the receipt of those draft Final Status Agreements

8

**GLADIUS NETWORK LLC'S COMPLAINT**

themselves). Plaintiff's initial electronic signature, affixed to the Memorandum on November 9 and never updated or changed thereafter, remained on the December 8 version.

26.     Defendant never sent to Plaintiff an executed version of the Final Status Agreements.

27.     Based on Plaintiff's continuing understanding that the Final Status Agreements, not the Memorandum, would form the basis of any potential agreement between the parties, Plaintiff continued its attempts to negotiate the terms of the draft Final Status Agreements with Defendant over the succeeding months.

### c.     The Parties' Negotiations Fall Apart, Plaintiff Learns of Defendant's Material Misrepresentations and Defendant Threatens Litigation

28.     The parties made very little progress in negotiations over the next two months. At all times that Defendant and Plaintiff were communicating regarding the Memorandum or negotiating the Final Status Agreement, from November 6, 2017 onwards, Plaintiff was operating out of its principal place of business in Washington, D.C.

29.     On January 25, 2018, Plaintiff contacted Defendant to clarify how the transfer of equity and tokens would take place if Defendant opted to sign the draft Final Status Agreements.

30.     On January 29, 2018, Defendant provided to Plaintiff certain edits to the Purchase Agreement and License and Services Agreement, but left the material terms—including those terms not appearing in the various iterations of the Memorandum, e.g., all terms beneficial to Gladius or otherwise constituting additional consideration to Gladius—intact. In so doing, Defendant clearly communicated its understanding that those terms were part of the transaction being negotiated between the parties, notwithstanding the absence of those terms from the Memorandum.  Over the next several days, the parties discussed re-establishing negotiations

9

between their respective counsel regarding additional revisions to the agreements and their ultimate execution.

31.     In addition, Plaintiff had begun to develop certain concerns regarding Defendant's suitability as a business partner. These concerns were based on, *inter alia*, the Founders' increasing familiarity with the Blockchain industry and the demands and expectations of their potential customer base as well as the parties' inability to reach agreement on material terms of the Final Status Agreements.

32.     Plaintiff was also presented with additional information regarding the extent of the involvement of Defendant's purported independent advisor, Gabriel Shalon, in Defendant's business. Prior and up to the execution of the Memorandum by Plaintiff, Mr. Shalon, who had been fined by the United States government in connection with the hacking of a number of financial institutions, was represented to Plaintiff by Defendant as a third party advisor who had been temporarily hired by Defendant for his expertise in cyber security. Following Plaintiff's execution of the Memorandum, however, Mr. Shalon contacted Plaintiff and asserted that he exercised control and/or ownership over Defendant.  This made Plaintiff uncertain about the extent of Mr. Shalon's involvement and constituted further cause for concern regarding the risk such involvement might pose to Plaintiff's business model.

33.     Accordingly, in February 2018, Plaintiff requested that the parties engage in negotiations for a walk-away agreement, given their failure to date to reach a contractual agreement regarding the terms of the contemplated Final Status Agreements. Defendant readily agreed to engage in such negotiations.

34.     Those discussions, begun in February 2018, quickly deteriorated. In its communications, Defendant, which had previously acknowledged that the Memorandum was

simply a foundation upon which the parties would negotiate the ensuing Purchase Agreement, License and Services Agreement, and Advisory Agreement, began asserting that the version of the Memorandum it had belatedly provided to Plaintiff was in fact the legally binding contract between the parties notwithstanding its explicit language to the contrary and its silence regarding many of the material terms which had been exhaustively discussed and in many cases agreed upon by the parties in the months prior.

35.     Defendant has now demanded that Plaintiff either (a) treat the Memorandum as a binding contract entitling it to, *inter alia*, a 15% ownership stake in Plaintiff *plus* an additional $4 million in cash (without providing any of the contemplated consideration other than the 90 Bitcoin advanced to Plaintiff in November 2017 for the token purchase) or (b) make extortionate payments worth more than *fourteen times* Defendant's prior advance payments in order to effectuate any "walk-away."

36.     Defendant has repeatedly threatened to bring litigation if Plaintiff fails to acquiesce. For example, on July 3, 2018, Defendant's counsel emailed Plaintiff's counsel advising that Defendant had "decided to pursue legal proceedings" if Plaintiff refused to inform Defendant by when a settlement was to be reached and cash payment made in exchange for a release of potential legal claims. In addition, on July 16, 2018, Defendant's counsel sent Plaintiff a demand letter seeking, among other things, more than $8.4 million in cash payments and stating that "[f]ailure to respond to our above demand may leave [Krypton] with no choice but to pursue all appropriate legal action, whether civil and/or other remedies."

37.     In addition to threats of litigation by Defendant's counsel, an individual claiming to work as a journalist for an online magazine has reached out to Plaintiff on several occasions, threatening to write a damaging article about Plaintiff, containing false and potentially defamatory

**GLADIUS NETWORK LLC'S COMPLAINT**

information regarding Plaintiff and the Founders. Plaintiff understands that the online magazine is in fact owned and controlled by Defendant.

38.     Moreover, and for reasons unbeknownst to Plaintiff, Defendant has refused to contemplate the return of its payment in Bitcoin (the currency in which the advance payments were made) but insists that all monies be returned in either United States dollars or Euros.

39.     Recent developments have also given Plaintiff reason to believe that Krypton has made repeated material misrepresentations to it in the course of their negotiations.

40.     In particular, while negotiations surrounding the walk-away agreement were underway, Plaintiff was contacted by a third party, Vladimir Smirnov. Mr. Smirnov, a Russian citizen, informed Plaintiff that the purpose of his communication was to inquire about his initial investment in Plaintiff.

41.     This came as a surprise to Plaintiff. Although Mr. Smirnov (and Mr. Shalon, an associate of his) had been involved in certain conversations between Plaintiff and Defendant in November and December 2017, Defendant had led Plaintiff to believe that both individuals had merely been third-party consultants with particular expertise in Blockchain and the cyber-security industry more generally. Indeed, Plaintiff had specifically denied that Mr. Smirnov or Mr. Shalon were the sources of funds to be invested in Krypton.

42.     Mr. Smirnov informed Plaintiff that Mr. Tzorya was simply a "frontman" for Defendant, and that Defendant had agreed, prior to execution of the Memorandum, to transfer control of Krypton to Mr. Smirnov and certain associates in exchange for, *inter alia*, the funding to be provided to Plaintiff as part of the equity purchase and token investment the Parties had been negotiating. According to Mr. Smirnov, Defendant, and specifically Mr. Tzorya, has since refused to comply with that agreement.

**GLADIUS NETWORK LLC'S COMPLAINT**

43.     Further, Mr. Smirnov informed Plaintiff that the two transfers of Bitcoins to Plaintiff, which had occurred in November while negotiations were ongoing and for which Defendant had purported to be responsible, were actually undertaken by Mr. Smirnov and/or his associates. On information and belief, Mr. Smirnov and/or his associates directly transferred these funds in anticipation of becoming Defendant's controlling shareholder, and thereby having an equity interest in Plaintiff once the Purchase Agreement and License and Services Agreement were executed.

44.     Defendant, while previously acknowledging during negotiations that the advance payments it had transferred to Plaintiff in November had been acquired pursuant to a purported "Convertible Loan Agreement" with an entity named Oldypak Capital LLC ("Oldypak"), failed to inform Plaintiff that Oldypak was controlled by Mr. Smirnov. Moreover, Defendant also never informed Plaintiff that the advance payments it had received had actually never been transferred to Krypton pursuant to any such "Convertible Loan Agreement", but had in fact been transferred directly from two digital wallets belonging to Mr. Smirnov and/or his associates, potentially including Mr. Shalon.

45.     Even more concerning to Plaintiff, Defendant has refused to provide Plaintiff a complete copy of the purported "Convertible Loan Agreement" between it and Oldypak, and the two pages it did provide suggested that, to the extent it was ever executed at all, it was entered into *after* the first advance payment of Bitcoin was made to Plaintiff.  This, along with other discrepancies in the document, have called the validity of that purported agreement into question. Nor has Defendant ever informed Plaintiff of its purported representations to Mr. Smirnov regarding the consideration for his providing such funding, i.e., control of Krypton itself.

46.     As a result of its concerns, and prior to commencing this action, Plaintiff offered to return (and now has returned) the full amount of the advance payments it had previously received to the digital cryptocurrency wallets from which the funds were initially transferred. Further, Plaintiff has offered to compensate Defendant at a reasonable rate of interest for the time and effort expended during negotiations, as well for the tokens it purchased (at an 80% discount) and any referrals to token purchasers for which it was responsible.

47.     Defendant allowed this offer to expire without making any attempt to make a counteroffer, and has continued to threaten to bring litigation if Plaintiff does not comply with the totality of its demands.

48.     In light of these facts, Plaintiff seeks a declaratory judgment that the Memorandum is void and unenforceable, as the Memorandum lacks the requisite material terms to render it enforceable, and neither party intended for it to serve as a binding contract at the time of execution. Alternatively, Plaintiff seeks rescission of the Memorandum, if deemed a binding contract, on the grounds that Defendant misrepresented material facts prior to and up until execution of the Memorandum, including the identity of the legal owner of the funds transferred to Plaintiff, and the existence of a contractual right or option for one or more third parties (including Mr. Smirnov) to become the controlling shareholder(s) of Defendant.

## II.     JURISDICTION AND VENUE

49.     This Complaint is filed, and this Court has subject matter jurisdiction of the matters complained of, pursuant to 28 U.S.C. § 1332, in that the amount in controversy exceeds $75,000, exclusive of interest and costs, and the action is between a citizen of a state and a citizen of a foreign state.

**GLADIUS NETWORK LLC'S COMPLAINT**

50.     Venue is proper in this District pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims occurred in this District and because Defendant transacts business and/or has purposefully availed itself of the privilege of conducting activities giving rise to this action in this District.

### III.      DESCRIPTION OF THE PARTIES

**Plaintiff**

51.     Plaintiff Gladius Network LLC is, and at all relevant times was, a Nevada limited liability company with its principal place of business in Washington, D.C. Plaintiff is engaged in the business of providing cyber protection networks to customers by utilizing Blockchain technologies.

**Defendant**

52.     Defendant Krypton Blockchain Holdings Ltd. (d/b/a Krypton Capital) is, and at all relevant times was, a Maltese corporation with its principal place of business in Kyiv, Ukraine. Krypton Blockchain Holdings Ltd. is engaged in the business of investing in cryptocurrency and Blockchain related companies.

### FIRST CLAIM FOR RELIEF

**(28 U.S.C. 2201 *et seq.*, Declaratory Judgment Concerning the Validity of the Memorandum)**

53.     Plaintiff re-alleges and incorporates herein by reference the allegations of paragraphs 1 through 52 of this Complaint.

54.     Plaintiff and Defendant, by executing the Memorandum, entered into a non-binding preliminary understanding regarding the shape of the transaction which would ultimately be negotiated and finalized between the parties. After the parties had signed the Memorandum, both

**GLADIUS NETWORK LLC'S COMPLAINT**

sides continued to engage in good faith negotiations to draft the three Final Status Agreements: the Purchase Agreement, the License and Services Agreement, and the Advisory Agreement. Defendant has acknowledged in communications with Plaintiff that the Purchase Agreement, the License and Service Agreement, and the Advisory Agreement, which were never signed, embodied unsuccessful attempts to memorialize the contractual obligations of the transactions contemplated in the Memorandum and in the parties' extensive discussions in November 2017, many of which were not reflected in the text of any of the draft Memoranda exchanged between the parties.

55.     The Purchase Agreement, the License and Services Agreement, and the Advisory Agreement contained a large number of additional and revised material terms compared to those contained in the Memorandum. Notably, the License and Services Agreement contemplates an entirely different exchange of consideration with respect to a transfer of an equity interest in Plaintiff to Defendant, the Purchase Agreement contains additional terms with respect to the quantity of consideration and the time period in which the transaction would take place, and the Advisory Agreement provides additional consideration in the form of advisory services in exchange for the 10% referral fee contemplated in the Memorandum.

56.     Further, it was never the intent of the parties to be bound by the Memorandum. The Memorandum itself contemplates that its sole purpose was only to "set down on paper the main areas of concern that have been agreed by the parties," and the Memorandum expressly references future negotiations regarding executable contracts that would embody the transactions envisioned in the Memorandum. Nor does the Memorandum contain an integration clause or any language suggesting that it was intended to be a binding contract or anything other than a generalized statement of the parties' decision to move forward with negotiations.

**GLADIUS NETWORK LLC'S COMPLAINT**

57.     Likewise, the actions of the parties, which continued to negotiate the Purchase Agreement, the License and Services Agreement, and the Advisory Agreement based on the mutual understanding that they would represent the contractualized transactions referenced in the Memorandum once executed, demonstrate the parties' lack of intent to be bound.

58.     By reason of the facts stated herein, Plaintiff requests that this court declare the rights, status, and other legal relations of the parties in the form of a declaratory judgment that the Memorandum is not a valid or enforceable agreement.

<u>**SECOND CLAIM FOR RELIEF**</u>

**(Material Misrepresentation)**

59.     Plaintiff re-alleges and incorporates herein by reference the allegations of paragraphs 1 through 52 of this Complaint.

60.     Prior to and up through Plaintiff's execution of the Memorandum, Plaintiff understood from Defendant that the funds provided to Plaintiff were legally controlled by Defendant.

61.     Defendant's failure to disclose to Plaintiff information surrounding the source of the initial fund transfer and Mr. Smirnov's claim to majority ownership or an exercisable right thereto amount to misrepresentations of material facts. Defendant functionally concealed from Plaintiff the true parties with which it was doing business, which would have significantly influenced Plaintiff's decision-making process with respect to the Memorandum and ensuing negotiations.

62.     Plaintiff's decision to sign the Memorandum on the basis of Defendant's representations regarding its business was reasonable. Until after the Memorandum was signed, Plaintiff received no information suggesting that Mr. Smirnov possessed an exercisable right to

17

**GLADIUS NETWORK LLC'S COMPLAINT**

majority share ownership, and Defendant affirmatively represented that the money being transferred to Plaintiff was within its legal control and had been transferred from Defendant and not from an undisclosed third party such as Mr. Smirnov. Plaintiff relied on these representations and under the circumstances, a reasonable party would have been induced to sign the November 9 Memorandum.

### PRAYER FOR RELIEF

WHEREFORE, as a result of the foregoing, Plaintiff Gladius Network LLC prays for relief as follows:

1. Declaratory judgment that the Memorandum is void and unenforceable;

2. Rescission of the Memorandum, if deemed a binding contract, based on the material misrepresentations made by Defendant prior to and up through Plaintiff's execution of the Memorandum; and

3. All such further costs, fees and expenses, including attorneys' fees and expenses, which this Court deems equitable.

Dated:  July 23, 2018                    WINSTON & STRAWN LLP

By:   /s/ Adam S. Nadelhaft
ADAM S. NADELHAFT
Bar No. 49012
MICHAEL L. LOESCH
Bar No. 993167
WINSTON & STRAWN LLP
1700 K Street, N.W.
Washington, D.C. 20006-3817
Telephone:  (202) 282-5000
Facsimile:   (202) 282-5100
Email:        anadelhaft@winston.com
                   mloesch@winston.com

GEORGE E. MASTORIS
WINSTON & STRAWN LLP

18

**GLADIUS NETWORK LLC'S COMPLAINT**

200 Park Avenue
New York, New York 10166-4193
Telephone:  (212) 294-6700
Facsimile:  (212) 294-4700
Email:        gmastoris@winston.com

Attorneys for Plaintiff Gladius Network
LLC

**GLADIUS NETWORK LLC'S COMPLAINT**